UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) CRIMINAL NO.: 26MJ4166DHH |
| CESAR GONZALEZ | ) |
| | ) |
| | ) |
| Defendant. | ) |

**DEFENDANT'S MOTION TO REVOKE THE MAGISTRATE JUDGE'S DETENTION ORDER AND REQUEST FOR IMMEDIATE RELEASE WITH CONDITIONS**

Cesar Gonzalez, by his attorney, William J. O'Neil, respectfully moves this Honorable Court to vacate Magistrate Judge Pym's detention order pursuant to 18 U.S.C. § 3145(b) and order Mr. Gonzalez released from custody pursuant to the Bail Reform Act (BRA) and the Fifth Amendment's Due Process Clause. This motion arises under 18 U.S.C. § 3145(b), which provides for de novo review of a magistrate judge's detention order. *See, e.g.*, *United States v. Groves*, 693 F.Supp.3d 106, 109 (D.MA 2023) citing *United States v. Tortora,* 922 F.2d 880, 883 n.4 (1st Cir. 1990), *United States v. Torres*, 929 F.2d 291, 292 (7th Cir. 1991) (although § 3145 "speaks of 'review' by the district judge, the court may start from scratch"); *United States v. Clark*, 865 F.2d 1433 1436 (4th Cir. 1989). A motion for revocation or amendment "shall be determined promptly," reflecting the serious nature of detaining any defendant unnecessarily. § 3145(b). In support of this motion, Mr. Gonzalez states as follows:

On or about May 14, 2026, Mr. Gonzalez  was arrested in the Central District of California on a warrant from this district based upon a criminal complaint charging him with Conspiracy to distribute and possess with intent to distribute controlled substances pursuant to 21 U.S.C §846. Magistrate Judge Pym in the Central District of California held Mr. Gonzalez' initial appearance on May 14, 2026. At that Initial Appearance, Mr. Gonzalez waived a preliminary examination in that District.  The government moved for detention Judge Pym

1

conducted a detention hearing based upon the proffer of the parties. The Magistrate Judge ordered that Mr. Gonzalez be detained without prejudice.[1]

Upon Mr. Gonzalez' initial appearance in this District, he waived his right to a preliminary examination. However, based upon Judge Pym's statements that the detention order was entered without prejudice, he requested a de novo detention hearing before Magistrate Judge Hennessey. The government, while acknowledging that Judge Pym had stated that the order was without prejudice, contended that Mr. Gonzalez did not have the right to a de novo detention hearing before a magistrate in this District as a full detention hearing where 1) evidence was presented by proffer and 2) the Magistrate Judge made findings on the record. As a result, the government's position was that Mr. Gonzalez could move to reopen the detention hearing in the Central District of California or request review of the order in this District pursuant to 18 U.S.C. § 3145(b). Upon consultation with counsel, Mr. Gonzalez has chosen to request a review of the detention order in this district.

The government alleges that Mr. Gonzalez participated in the conspiracy by shipping kilogram-quantity shipments via UPS from Riverside County, California to co-defendant, Hai Son Pham in Central Massachusetts between January and July of 2024. The government alleges that these shipments were coordinated through text messages between Pham and co-defendant, Andres Montemayor, who resided in Texas. The government alleges that one shipment was seized by agents on July 23, 2024 at a UPS Distribution Center in Riverside, California. The government further alleges that Gonzalez was observed on surveillance video from a UPS Store in Beaumont California. as shipping the package that was seized by the agents.

In its motion for detention, the government alleged that pretrial detention was necessary to assure 1) Mr. Gonzalez' appearance as required and 2) the safety of any other person and the community. Due to the nature of the charges, the government contended that it was entitled to a presumption of detention pursuant to 18 U.S.C. § 3142(e) as Mr. Gonzalez is facing a drug charge with a 10-year or greater maximum penalty.

At the time of the detention hearing in the Central District of California, the government cited Mr. Gonzalez' "unverified background, a history of parole and probation violations, a

---

[1] The parties have reviewed the detention order from the Central District of California. The order does not indicate that the order was entered without prejudice. Both parties have accessed the audio of the detention order. Judge Pym clearly states that the order is without prejudice.

history of alcohol use, and no bail resources." The government noted the surveillance video described above related to the weight of the evidence in the case and alleged that the crime was committed while he was on probation for a California state conviction.

In this case, the statute creates a rebuttable presumption "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." § 3142(e)(3). To rebut that presumption, a defendant must produce "some evidence" that release conditions can reasonably assure the appearance of a person and safety of community. *United States v. Dillon,* 938 F.2d 1412, 1416 (1st Cir. 1991). The presumption inquiry proceeds in two steps. At Step 1, this Court must consider whether the defense has met the very low burden of production to rebut the presumption. As set forth below, Mr. Gonzalez has presented evidence that rebuts the presumption. At Step 2, this Court must consider the presumption alongside all of the other § 3142(g) factors—even if the presumption has not been rebutted. Release is warranted in this case because there are numerous facts under § 3142(g) that both rebut the presumption of detention and demonstrate that there are conditions of release that will reasonably assure both Mr. Gonzalez' appearance in court and the safety of the community.

As the Supreme Court held in *Salerno*, "In our society liberty is the norm, and detention prior to trial . . . is the carefully limited exception." 481 U.S. at 755. This presumption of release is encapsulated in the BRA, 18 U.S.C. § 3142. The statute states that the Court "shall order" pretrial release, § 3142(b), except in certain narrow circumstances. Even if the Court determines under § 3142(c) that an unsecured bond is not sufficient, the Court "shall order" release subject to "the least restrictive further condition[s]" that will "*reasonably assure*" the defendant's appearance in court and the safety of the community. § 3142(c)(1) (emphasis added). Under this statutory scheme, "it is only a 'limited group of offenders' who should be detained pending trial." *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987) (quoting S. Rep. No. 98-225, at 7 (1983), *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3189); *see also United States v. Byrd*, 969 F.2d 106, 109 (5th Cir. 1992) ("There can be no doubt that this Act clearly favors nondetention.").

## II. The Standard for Release in Presumption Cases

"[C]ase law emphasizes two checks that the BRA and the Constitution impose on the presumption: (1) [At Step 1,] there is an easy-to-meet standard for rebutting the presumption and

the prosecution always bears the burden of persuasion, and (2) [at Step 2,] the presumption alone does not warrant detention and must always be weighed along with other factors [in 3142(g)]."[2] However, a recent national study by the University of Chicago Law School's Federal Criminal Justice Clinic (FCJC) found that judges are not adhering to these two legal requirements and are giving the presumption greater weight than the law allows. Through court watching and qualitative interviews with stakeholders, this study found that the presumption is often treated as a de facto detention order, even though the law makes the presumption easily rebuttable and requires the government to bear—at all times—the "burden of proving that detention is genuinely necessary."[3] First, at Step 1, judges are not applying the correct rebuttal standard: "in 95% of presumption cases that held a Detention Hearing in our study, judges either concluded that the arrestee had failed to rebut the presumption or did not mention whether the presumption was rebutted."[4] Second, "data also suggest that judges often disregard Step 2 of the legal test, where they are supposed to weigh the rebutted or unrebutted presumption along with all of the other pretrial release factors in reaching the ultimate release or detention determination."[5]

The DOJ's policy directive seeks to mitigate high detention rates in presumption cases. It instructs that "[p]rosecutors should not seek detention merely because the Bail Reform Act permits such an argument to be made or presumes that detention, based on the charges, is appropriate (as it does for many drug charges, *see* 18 U.S.C. § 3142(e)(3))."[6] The directive requires prosecutors to do a "case- and defendant-specific" analysis in deciding whether to seek detention in all cases, including presumption cases.[7]

---

[2] Alison Siegler, Freedom Denied: How the Culture of Detention Created a Federal Jailing Crisis 151 (2022), https://freedomdenied.law.uchicago.edu/; see also Bail, 51 GEO. L.J. ANN. REV. CRIM. PROC. 396, 407–08 (2022), https://www.westlaw.com/Document/I43b1e73f204811ed9f24ec7b211d8087/View/FullText.html?transiti onType=Default&contextData=(sc.Default)&VR=3.0&RS=cblt1.0.

[3] Id. In 95% of contested Detention Hearings observed by the Clinic, the court did not mention whether the presumption was rebutted or concluded the presumption was not rebutted. Id. at 148. When the court found that the presumption had not been rebutted, the defendant was always detained. Id.

[4] *Id.* at 161.

[5] Id. at 161–62.

[6] U.S. Dep't of Just., Just. Manual § 9-6.100 (2023), https://www.justice.gov/jm/jm-9-6000-release-and-detention-pending-judicial-proceedings#9-6.100

[7] Id. In response to the FCJC study's findings, some federal judges and defense attorneys have also emphasized that federal pretrial detention is under "scrutinized," with Judge Nancy Gertner (ret.) telling USA Today "there should be court watchers all around the country." Tami Abdollah, Study: Federal Magistrates, Prosecutors Misunderstand Bail Law, Jailing People Who Should Go Free, USA TODAY (Dec. 7, 2022), https://www.usatoday.com/story/news/politics/2022/12/07/federal-judges-misapply-baillaw-

### III. The Statutory Presumption of Detention Should Be Viewed with Caution Because They Lead to High Rates of Detention for Low-Risk Defendants.

Congress enacted the statutory presumption of detention in the Bail Reform Act of 1984 (BRA) to detain "a small but identifiable group of particularly dangerous defendants."[8] Indeed, Congress intended the presumptions to operate primarily on "*major* drug traffickers."[9] Congress emphasized that detention should be presumed only for these major drug traffickers, essentially drug kingpins.[10] "Congress considered at length arrestees' pretrial liberty interests, and concluded that the constitutional concerns with pretrial detention required a narrowly tailored statute to secure community safety and appearance in court."[11]

But the presumption of detention has not worked as intended, and federal pretrial detention rates have skyrocketed since the BRA was enacted, rising from 19% in 1985 to 75% in 2019.[12] A study by the Administrative Office of the Courts (AO) attributed this "massive increase"[13] in detention rates to the presumption of detention, especially as it is applied to low risk defendants.[14] The study concludes that the statutory presumption in drug and firearm cases applies to nearly half of all federal cases and to 93% of drug cases.[15] The 2022 FCJC study demonstrated that the detention rate for defendants facing a presumption of detention is nearly 20 percentage points higher than that for defendants not facing a presumption, even though today

---

illegally-jail-arrestees-study-says/10798949002/.

[8] S. REP. NO. 98-225, at 6.

[9] S. REP. NO. 98-225, at 20 (emphasis added).

[10] S. REP. NO. 98-225, at 7 (emphasizing that it was only for this "limited group of offenders that the courts [needed the] . . . power to deny release pending trial").

[11] Siegler, supra note 1, at 73 (citing S. REP. NO. 98-225, at 8–10).

[12] Pretrial Release and Detention: The Bail Reform Act of 1984, BUREAU OF JUST. STAT. SPECIAL REP., at 2 (Feb. 1988), https://www.bjs.gov/content/pub/pdf/prd-bra84.pdf (Table 1) (18.8% of defendants detained pretrial in 1985); Judicial Business: Federal Pretrial Services Tables, ADMIN. OFF. U.S. COURTS ("AO Table"), Table H-14 (Sept. 30, 2019) https://www.uscourts.gov/sites/default/files/data_tables/jb_h14_0930.2019.pdf (74.8% of defendants detained pretrial in 2019); see also AO Table H-14A (Sept. 30, 2019), https://www.uscourts.gov/sites/default/files/data_tables/jb_h14a_0930.2019.pdf (61% detention rate excluding immigration cases).

[13] Amaryllis Austin, The Presumption for Detention Statute's Relationship to Release Rates, 81 FED. PROB. 52, 61 (2017) (citing Christopher T. Lowenkamp et al., Investigating the Impact of Pretrial Detention on Sentencing Outcomes (The Laura and John Arthur Foundation 2013), archived at https://perma.cc/8RPX-YQ78).

[14] Id. at 57.

[15] Id. at 55 (the drug presumption "applied to between 42 and 45 percent of [all federal] cases every year").

"there is no evidence that people in presumption cases pose any greater risk than those in nonpresumption cases."[16]

The AO study confirms that the presumption increases the detention rate without advancing community safety. Rather than jailing the worst of the worst, the presumption overincarcerates the lowest-risk offenders in the system, people who are stable, employed, educated, and have minimal to no criminal history.[17] When a low-risk individual is not facing a presumption, they're released 94% of the time.[18] Yet an identically low-risk individual in a presumption case is released just 68% of the time.[19] Past testimony before Congress relied on this government study to call for reform: "These presumptions must be changed because they've had far-reaching and devastating consequences that were unforeseen and unintended by Congress."[20] Moreover, "[t]he BRA's legislative history demonstrates that Congress did not intend the drug presumption to apply so broadly," and only intended it to apply to "major drug traffickers," not people like Mr. Gonzalez.[21]

Relying on the groundbreaking findings of the AO study, the Judicial Conference's Committee on Criminal Law recently determined "that the § 3142(e) presumption was unnecessarily increasing detention rates of low-risk defendants, particularly in drug trafficking cases."[22] To address this problem, the Judicial Conference proposed significant legislative reform that would amend the presumption of detention in drug cases "to limit its application to defendants described therein whose criminal history suggests that they are at a higher risk of

---

[16] Siegler, supra note 1, at 158, 160 & fig.19, 153.

[17] Id. at 57.

[18] Id.

[19] Id.

[20] See The Administration of Bail by State and Federal Courts: A Call for Reform: Hearing Before the Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary, 115th Cong. (2019), https://judiciary.house.gov/calendar/eventsingle.aspx?EventID=2256; Testimony of Alison Siegler at PDF 6–7 (Nov. 14, 2019), https://docs.house.gov/meetings/JU/JU08/20191114/110194/HHRG-116-JU08-TTF-SieglerA-20191114.pdf; see also Written Statement of Alison Siegler at 13–17 (Nov. 14, 2019), https://docs.house.gov/meetings/JU/JU08/20191114/110194/HHRG-116-JU08-Wstate-SieglerA-20191114.pdf (calling for the complete elimination of the presumptions in drug and gun cases).

[21] Erica Zunkel & Alison Siegler, The Federal Judiciary's Role in Drug Law Reform in an Era of Congressional Dysfunction, 18 OHIO ST. J. CRIM. L. 283, 292 (2020) (analyzing legislative history of presumptions in detail).

[22] Report of the Proceedings of the Judicial Conference of the United States 10 (Sept. 12, 2017), archived at https://perma.cc/B7RG-5J78; see also Siegler, supra note 1, at 152 ("The Judicial Conference relied on a study finding that the presumption increased detention orders by 26% for people in the lowest Pretrial Risk Assessment (PTRA) category. The same study found that detention rates in gun presumption cases climbed from 66% in 1995 to 86% in 2010. These findings strongly suggest that judges place undue weight on the presumption of detention.").

failing to appear or posing a danger to the community or another person."[23] In the wake of the Judicial Conference's recommendation, then Judiciary Committee Chair Dick Durbin introduced a bipartisan bill in the Senate that would eliminate the presumption in all drug cases.[24]

This Court can certainly take these developments into account when evaluating the presumption of detention in this case. Based on the proposed legislation, commentators have urged judges to give "little, if any, weight to the drug presumption of detention at the detention hearing stage."[25]

The problems with the statutory presumption of detention are important to Mr. Gonzalez' motion because, as the AO study confirms, high federal pretrial detention rates come with significant and wide-ranging "social and economic costs."[26] For example, the study explains that "[e]very day that a defendant remains in custody, he or she may lose employment which in turn may lead to a loss of housing. These financial pressures may create a loss of community ties, and ultimately push a defendant towards relapse and/or new criminal activity."[27] Indeed, the economic harms stemming from being detained pretrial persist for years: even three to four years after their Detention Hearing, people released pretrial were still 24.9% more likely to be employed than those who were detained.[28] And the repercussions of pretrial detention overwhelmingly fall on poor people of color. Nationally, 81% of people charged with federal crimes are people of color.[29] In addition, "90% of defendants in federal court cannot afford to hire their own attorney," a clear indication that most people facing pretrial detention are poor.[30] These harms are not just limited to the detained person—once someone is incarcerated, the odds that his children become homeless increase by 95%, and the odds that his partner becomes

---

[23] Judicial Conference, supra note 21, at 10.

[24] Smarter Pretrial Detention for Drug Charges Act, S. 309, 117th Cong. (introduced Feb. 12, 2021).

[25] Zunkel & Siegler, supra note 20, at 289.

[26] Austin, supra note 12, at 61; see also Siegler, supra note 1, at 22 n.5, 61–72 (discussing the devastating consequences of high jailing rates on individuals, their families, their communities, and society, and citing studies in support).

[27] Id. at 53; see also Alexander M. Holsinger & Kristi Holsinger, Analyzing Bond Supervision Survey Data: The Effects of Pretrial Detention on Self-Reported Outcomes, 82(2) FED. PROB. 39, 42 (2018), archived at https://perma.cc/LQ2M-PL83 (finding that for people detained pretrial for at least three days, 76.1% had a negative job-related consequence and 37.2% had an increase in residential instability).

[28] Will Dobbie et al., The Effects of Pretrial Detention on Conviction, Future Crime, and Employment: Evidence from Randomly Assigned Judges, 108(2) AMER. ECON. REV. 201, 204 (2018), archived at https://perma.cc/X77W-DAWV.

[29] Siegler, supra note 1, at 24

[30] Id.; See Ad Hoc Comm. to Review the Criminal Justice Act, 2017 Report of the Ad Hoc Committee to Review the Criminal Justice Act at xiv (2018), https://perma.cc/FM2Z-8GW3.

homeless increase by 49%.[31] The other emotional and psychological harms visited upon the children of incarcerated parents are well-documented.[32]

Pretrial jailing imposes tremendous human suffering: 120,000 human beings are currently locked in federal jails, spending an average of nearly 1 year in jail. In this district the average time spent in pretrial detention is almost 500 days.[33] While in jail, people suffer major personal losses—their job, home, custody of their children.[34] These harms also impact the loved ones and communities of those detained.[35] "The brutal reality is that people detained pretrial in federal jails are deprived of necessary medical care, live in dangerously overcrowded conditions, are subjected to violence, and suffer high rates of COVID-19 infection."[36] Moreover, the high federal detention rates fall overwhelmingly on people of color and those from low-income backgrounds.[37] The first few days of detention can also be dangerous. According to the Bureau of  Justice Statistics, between 38% and 45% of all jailhouse rapes perpetrated on a male victim happen within three days of admission.[38] Over 40% of people who die in jail die within their first week.[39] Despite the trauma and danger inherent in the first few days of a jail stay, jails' physical and mental health screenings and treatment offerings are often inadequate.[40]

Data proves that pretrial detention does not make our communities safer or ensure appearance in court: "The harmful effects of pretrial detention cannot be justified as permissible consequences of protecting the community, since research shows that pretrial detention—for any

---

[31] For children, Christopher Wildeman, Parental Incarceration, Child Homelessness, and the Invisible Consequences of Mass Imprisonment, 651 THE ANNALS OF THE AMERICAN ACADEMY OF POLITICAL AND SOCIAL SCIENCE 74, 88 (2014); for partners, see Amanda Geller & Allyson Walker Franklin, Paternal Incarceration and the Housing Security of Urban Mothers, 76 J. FAM. & MARRIAGE 411, 420 (2014).

[32] See, e.g., Joseph Murray et al., Children's Antisocial Behavior, Mental Health, Drug Use, and Educational Performance After Parental Incarceration: A Systematic Review and Meta-Analysis, 138(2) PSYCHOLOGICAL BULLETIN 175, 186 (2012).

[33] AO Table H-15 (June 30, 2025) (120,124); AO Table H-9A (September 30, 2024) (353 days nationally and 498 days in the District of Massachusetts).

[34] See Siegler, supra note 1, at 62 (citing studies).

[35] *Id.* at 62.

[36] Id. at 63.

[37] Id. at 24.

[38] Allen J. Beck, et al., Sexual Victimization in Prisons and Jails Reported by Inmates, 2008–09, Bureau of Justice Statistics (2010), 22–23, archived at https://perma.cc/H33S-QFPK

[39] Margaret Noonan, et al., Mortality in Local Jails and State Prisons, 2000–14—Statistical Tables, Bureau of Justice Statistics 8 (2016), archived at https://perma.cc/B9CN-ST3K.

[40] See Laura M. Maruschak, et al., Medical Problems of State and Federal Prisoners and Jail Inmates, Bureau of Justice Statistics 9, 10 (2015), archived at https://perma.cc/HGT9-7WLL (comparing healthcare in prisons and jails); see also Faye S. Taxman, et al., Drug Treatment Services for Adult Offenders: The State of the State, 32 Journal of Substance Abuse Treatment 239, 247–49 (2007), archived at https://perma.cc/G55Z-4KQH

amount of time—is correlated with an *increase* in recidivism."[41] The AO cites a famous study that found a relationship "between the pretrial detention of low-risk defendants and an increase in their recidivism rates, both during the pretrial phase as well as in the years following case disposition."[42] More recent studies have confirmed that pretrial detention is criminogenic[43] and cautioned that "lower crime rates should not be tallied as a benefit of pretrial detention."[44] One reason why pretrial detention is criminogenic is because jails' physical and mental health screenings and treatment offerings are often inadequate.[45] In addition, federal "pretrial detention is itself associated with increased likelihood of a prison sentence and with increased sentence length," even after controlling for criminal history, offense severity, and socio-economic variables.[46]

These stark statistics must also be considered in light of the fact that 99% of federal defendants are not rearrested for a violent crime while on pretrial release.[47] In other words, pretrial detention imposes enormous costs on criminal defendants, their loved ones, and the community, in a counterproductive attempt to prevent crimes that are extremely unlikely to happen in the first place. The presumption of detention also falls hardest on people of color, intensifying racial disparities in the federal system.[48] Conversely, releasing more people prior to

---

[41] Siegler, supra note 1, at 62 & n.102.

[42] Austin, supra note 12, at 54.

[43] Paul Heaton et al., The Downstream Consequences of Misdemeanor Pretrial Detention, 69 STAN. L. REV. 711, 718 (2017), archived at https://perma.cc/5723-23AS ("[D]etention is associated with a 30% increase in new felony charges and a 20% increase in new misdemeanor charges, a finding consistent with other research suggesting that even short-term detention has criminogenic effects."); Arpit Gupta et al., The Heavy Costs of High Bail: Evidence from Judge Randomization, 45 J. LEGAL STUD. 471, 496 (2016) ("[O]ur results suggest that the assessment of money bail yields substantial negative externalities in terms of additional crime.").

[44] Emily Leslie & Nolan G. Pope, The Unintended Impact of Pretrial Detention on Case Outcomes: Evidence from New York City Arraignments, 60 J.L. & ECON. 529, 555 (2017).

[45] See Laura M. Maruschak et al., Medical Problems of State and Federal Prisoners and Jail Inmates, BUREAU OF JUST. STAT., at 9 (2015), archived at https://perma.cc/HGT9-7WLL (comparing healthcare in prisons and jails); see also Faye S. Taxman et al., Drug Treatment Services for Adult Offenders: The State of the State, 32 J. SUBSTANCE ABUSE TREATMENT 239, 247, 249 (2007), archived at https://perma.cc/G55Z-4KQH

[46] James C. Oleson et al., The Sentencing Consequences of Federal Pretrial Supervision, 63 CRIME & DELINQUENCY 313, 325 (2014), archived at https://perma.cc/QAW9-PYYV.

[47] Thomas H. Cohen et al., Revalidating the Federal Pretrial Risk Assessment Instrument: A Research Summary, 82(2) FED. PROB. 23, 26 (2018), archived at https://perma.cc/8VM9-JH9T.

[48] Siegler, supra note 1, at 165–66 ("[M]ost arrestees facing a presumption are people of color, since they make up 75% of those convicted of qualify drug offenses nationwide. . . . Our data support the idea that the presumption may fall even more heavily on arrestees of color. . . . Of the cases in which prosecutors invoked the presumption during the Detention Hearing, 97% of the arrestees were people of color, and 3% were white."); Stephanie Holmes Didwania, Discretion and Disparity in Federal Detention, 115 NW. U. L. REV. 1261, 1265 (2021), https://scholarlycommons.law.northwestern.edu/nulr/vol115/iss5/1/

trial does not correlate with increased rates of failure to appear or rearrest for new crimes.[49] In fact, the rates at which people on federal pretrial release either fail to appear in court or are rearrested for a new crime are extraordinarily low, "with both sitting at approximately 1–2%."[50] "Strikingly, rates of nonappearance and rearrest are just as low in the federal courts with the *highest* pretrial release rates as they are in the districts with the *lowest* release rates."[51] There are also enormous fiscal costs associated with high federal pretrial detention rates. In 2021, it cost more than $35,000 to put a single person in jail for a year.[52] The FCJC study estimated that taxpayers spend "more than *one billion dollars* per year to pay for federal pretrial jailing."[53]

## IV. Case Law Emphasizes Two Checks That the BRA and the Constitution Impose on the Presumption of Detention.

Case law has established two checks that the BRA and the Constitution impose on the presumption: (1) there is an easy-to-meet standard for rebutting the presumption and the prosecution bears the burden of persuasion, and (2) the presumption alone does not warrant detention and must always be weighed along with other factors in § 3142(g).[54] In addition, it is impermissible to detain a defendant in a presumption case based solely on evidence of past dangerousness, the nature of the crime charged, or the weight of the evidence.

### A. Step 1: The Presumption is Easily Rebutted.

Under the law, very little is required for a defendant to rebut the presumption of detention and therefore, judges should find the presumption rebutted in most cases. To rebut the presumption, a defendant simply needs to produce "some evidence that he will not flee or endanger the community if released." *Dominguez*, 783 F.2d at 707; *see also United States v. Jessup*, 757 F.2d 378, 384 (1st Cir. 1985), *abrogated on other grounds by United States v. O'Brien*, 895 F.2d 810 (1st Cir. 1990) ("[T]o rebut the presumption, the defendant must produce some evidence."); *United States v. Gamble*, No. 20-3009, 2020 U.S. App. LEXIS 11558 at *1–2 (D.C. Cir. Apr. 10, 2020) (holding that "[t]he district court erred in concluding that appellant

---

[https://perma.cc/3E3R-N4VN].
[49] Siegler, supra note 1, at 24.
[50] Id.
[51] Id. at 25 fig.4.
[52] Id. at 23.
[53] Id. (emphasis added).
[54] Id. at 151.

failed to meet his burden of production to rebut the statutory presumption" regarding dangerousness because "appellant did 'offer some credible evidence contrary to the statutory presumption,'" including information that he had a job offer) (unpublished) (quoting *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985)).

This "burden of production is not a heavy one to meet." *Dominguez*, 783 F.2d at 707; *see also United States v. Wilks*, 15 F.4th 842, 846–47 (7th Cir. 2021) (explaining that the defense bears "a light burden of production" to rebut the presumption, "but the burden of persuasion always rests with the government"). Indeed, the presumption of detention is rebutted by "[a]ny evidence favorable to a defendant that comes within a category listed in § 3142(g) . . . including evidence of their marital, family and employment status, ties to and role in the community . . . and other types of evidence encompassed in § 3142(g)(3)." *Dominguez,* 783 F.2d at 707 (emphasis added); *Jessup*, 757 F.2d at 384. See also *United States v. Watson*, (D. MA, 25-mj-3116-KAR, September 11, 2025) Any "evidence of economic and social stability" can rebut the presumption. Dominguez, 783 F.2d at 707.

Notably, a defendant's ties to the community—standing alone—definitively rebut the presumption: "Where the defendant has presented considerable evidence of his longstanding ties to the locality in which he faces trial, as did [this defendant], the presumption contained in § 3142(e) has been rebutted." *United States v. Jackson*, 845 F.2d 1262, 1266 (5th Cir. 1988). As long as a defendant "come[s] forward with some evidence" pursuant to § 3142(g), the presumption of flight risk and dangerousness is definitively rebutted. *Dominguez,* 783 F.2d at 707 ("Any evidence favorable to a defendant that comes within a category listed in § 3142(g) can affect the operation of one or both of the presumptions. . . . Once this burden of production is met, the presumption is 'rebutted.'" (quoting Jessup, 757 F.2d at 384)); see also *O'Brien*, 895 F.2d at 816 (finding presumption of flight risk rebutted by evidence of effectiveness of electronic monitoring ankle bracelet together with posting of defendant's home).[55] Importantly, the government bears the burden of persuasion at all times. *Dominguez*, 783 U.S. at 707; *Jessup*, 757 F.2d at 384; *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985).

In *Dominguez*, for example, the Seventh Circuit determined that the defendants had

---

[55] To rebut the presumption of flight risk, for example, a defendant does not "have to prove that he would not flee—i.e., he would [not] have to persuade the judicial officer on the point. [Instead], he would only have to introduce a certain amount of evidence contrary to the presumed fact." *Jessup*, 757 F.2d at 380–81; accord *Dominguez*, 783 F.2d at 707.

sufficiently rebutted the presumption of detention by introducing fairly minimal evidence about their employment and family ties. 783 F.2d at 707. Both defendants were Cuban immigrants who were not U.S. citizens but had been in the country lawfully for five years, and neither had a criminal record. *Id.* One of the defendants was married and had family members in the United States; both were employed. *Id.* These facts alone were sufficient for the Seventh Circuit to find that defendants had rebutted the presumption. *Id.*

## B. Step 2: The Presumption Alone is Not Sufficient to Warrant Detention, and Must Be Weighed Along with the § 3142(g) Factors.

After the presumption is rebutted, the Court must weigh the presumption against all of the other evidence about the defendant's history and characteristics that tilts the scale in favor of release. *See Dominguez*, 783 F.2d at 707 ("[T]he rebutted presumption is not erased. Instead, it remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g)."); *Jessup*, 757 F.2d at 384 (holding that the judge should consider the rebutted presumption along with the § 3142(g) factors). The Court should not give the presumption undue weight if evidence relating to other § 3142(g) factors supports release.

## C. Forbidden Considerations in a Presumption Case

A judge may not detain a defendant in a presumption case based solely on (1) an unrebutted presumption alone, (2) evidence of the defendant's past dangerousness, or (3) the nature and seriousness of the crime charged, or (4) the weight of the evidence of the person's guilt.

First, the defendant never bears the burden of persuasion—even if the presumption is unrebutted. It is not incumbent on the defendant to "persuade the judge that there exist conditions of release that will reasonably assure the safety of the community."[56] That burden of persuasion lies with the government, the standard of which is always clear and convincing evidence. *Wilks*, 15 F.4th at 846–47 ("[T]he burden of persuasion always rests with the government and an unrebutted presumption is not, by itself, an adequate reason to order detention.").

Second, even if the presumption is not rebutted, a judge is prohibited from detaining a defendant "based on evidence that he has been a danger in the past[.]" *Dominguez,* 783 F.2d at 707. Instead, past dangerous conduct is relevant only to the extent that the government can

---

[56] Siegler, supra note 1, at 156.

prove—by clear and convincing evidence—that the defendant is "likely to continue to engage in criminal conduct undeterred [ ] by . . . release conditions." *Id*. Even when a defendant is charged with a serious crime or has a significant criminal history, there may be release conditions that will reasonably assure the safety of the community.

Third, to rebut the presumption of dangerousness, a defendant need not "demonstrate that narcotics trafficking [or another serious crime] is not dangerous to the community." *Id*. at 706. Instead, this Court must analyze the defendant's individual characteristics under § 3142(g).

In creating the presumption, Congress determined that the type of drug trafficking alleged in this indictment is a serious danger to the community. Especially significant is the drug network's ability to continue to function while the defendant awaits trial. See S.Rep. No. 225, 98th Cong., 2d Sess. 12, reprinted in 1984 U.S. Code Cong. & Ad.News 3182, 3195-96. *United States v. Portes,* 786 F.2d 758, 765 (7th Cir. 1985). Also, see *United States v. Arroyo-Reyes*, 32 F.3d 561 (1st Cir. 1994 unpublished) The government alleges that Mr. Pham was the leader of the DTO and is alleged to have continued in drug distribution activity until the date of his arrest. The government has not presented any evidence that Mr. Gonzalez was involved in drug distribution after July, 2024. Thus, the DTO continued operations well after Mr. Gonzalez' involvement ended.

Fourth, the Court is forbidden from relying solely on the weight of the evidence of guilt to detain a defendant in a presumption case. A defendant is not required to "'rebut' the government's showing of probable cause to believe that he is guilty of the crimes charged." *Id*. This makes sense—a person's likelihood of guilt is analytically distinct from whether there are conditions of release that will reasonably assure the person's appearance or the safety of the community.

## V. The Presumption of Detention Is Rebutted in This Case.

As detailed below, there is more than "some evidence that Mr. Gonzalez will not flee or endanger the community if released." *Dominguez*, 783 F.2d at 707. It is imperative that this Court follow the letter of the law by giving the presumption of detention "the low weight to which it is assigned by case law."[57] The defense has therefore rebutted the presumption in this case. Mr. Gonzalez has presented evidence that:

---

[57] Siegler, supra note 1, at 146.

### A. Ties to the Community:

Mr. Gonzalez was born in West Covina, California and has spent his entire life in the state of California. He presently lives in a home owned by his parents with his wife and children in Rancho Mirage, California. Two siblings live within the Central California District. is a United States citizen by birth. He does not have a passport and has not travelled out of the country within the last 10 years.

For the past two years, Mr. Gonzalez has been involved with the Rollerz Only Car Club Riverside, California chapter. His involvement with the club had included participation in the annual "Christmas in July" program where the group organizes a vintage car show each July and donates the proceeds to provide Christmas gifts for children in the community. In addition, Mr. Gonzalez is involved in his local church community.

Although Mr. Gonzalez has no ties to the charging district, he does have the financial and emotional support of his family. A return to work will allow him to have the financial resources to commute from California to Massachusetts if required to attend court hearings.

### B. Family Ties:

Mr. Gonzalez has been married to Yvette Gonzalez for two years. They have a newborn child together. He has two children from previous relationships. His adult son resides in Riverside County, California, and his 17-year-old daughter resides with Mr. Gonzalez and his wife at the home owned by Mr. Gonzalez' parents in Rancho Mirage, California.

Mr. Gonzalez' parents, Jose and Rosario Gonzalez, own a parcel of land in Menifee, California with an estimated fair market value of $40,000.00. They are willing to post that parcel to ensure Mr. Gonzalez' compliance with any conditions of release imposed by the Court.

### C. Employment History:

Mr. Gonzalez has been self-employed as a mobile mechanic and auto repairman for three years. He has also been associated with Best Auto Repair, LLC. In San Jacinto, California, demonstrating strong work ethic, reliability, and dedication to his responsibilities. He earns $500-$700 weekly income. He has prior work experience in construction and painting.

### D. Criminal History

Although Mr. Gonzalez has a criminal history dating back to 2002, his latest felony charges took place over ten years ago. He does have three OUI cases which took place between

14

2019 and 2022. They are all misdemeanors. At the time of the alleged offense in 2024, Mr. Gonzalez was on unsupervised probation out of Riverside Superior Court.

## VI. Regardless of the Presumption, Cesar Gonzalez Must Be Released Because There are Conditions That Will Reasonably Assure Appearance and Safety.

Regardless of whether this Court finds that the presumption of detention is rebutted, Mr. Gonzalez must be released because there are conditions that will reasonably assure the safety of the community and his appearance in court. The presumption of detention, on its own, is insufficient to justify detention. *Wilks*, 15 F.4th at 847 ("[A]n unrebutted presumption is not, by itself, an adequate reason to order detention."); *Jackson*, 845 F.2d at 1266 (concluding that if the presumption alone could justify detention, "there would be no need for Congress to have specified 'the weight of the evidence against the person' as a separate factor for the court to consider"). The BRA requires courts to weigh all the § 3142(g) factors in every case, even when the presumption has not been rebutted. *Wilks*, 15 F.4th at 847.[58]

A defendant cannot be detained "unless a finding is made that no release conditions '*will* reasonably assure . . . the safety of the community'" and the defendant's appearance in court. *Dominguez*, 783 F.2d at 707 (quoting § 3142(e)). Here, the government has not carried its high burden of proving by clear and convincing evidence that there are *no* release conditions that will reasonably assure the safety of the community. *See id.* at 708 n.8. The government also has not proved by a preponderance of the evidence that there are no conditions that would reasonably assure Mr. Gonzalez' appearance in court. Thus, he cannot be detained.

The following conditions of release under § 3142(c)(1)(B), and any other conditions the Court deems necessary, will reasonably assure Cesar Gonzalez' appearance in court and the safety of the community

- Place Cesar Gonzalez in custody of his wife Yvette Escobido "who agrees to assume supervision and to report any violation of a release condition to the court" [§3142(c)(1)(B)(i)]
- Maintain or actively seek employment [(ii)]
- Follow restrictions on "personal associations, place of abode or travel" including a curfew and monitoring. [(iv)]

---

[58] S. REP. NO. 98-225, at 23, as reprinted in 1984 U.S.C.C.A.N. at 3206 ("Subsection (g) enumerates factors that are to be considered by the judicial officer in determining whether there are conditions of release that will reasonably assure the appearance of the person and the safety of any other person and the community. Since this determination is made whenever a person is to be released or detained under this chapter, consideration of these factors is required . . . a court is expected to weigh all the factors in the case before making its decision as to risk of flight and danger to the community." (emphasis added)).

- Avoid "all contact with any potential witnesses who may testify concerning the offense" [(v)]
- Report on a "regular basis" to Probation [(vi)]
- Refrain from possessing "a firearm, destructive device, or other dangerous weapon [(viii)]
- Refrain from "excessive use of alcohol" [(ix)]
- Undergo "medical, psychological, or psychiatric treatment, including treatment for alcohol or drug dependency" [(x)].
- Post real estate belonging to Mr. Gonzalez' parents to ensure his compliance with conditions of release [(xi)]
- "[A]ny other condition that is reasonably necessary to assure the appearance of the person as required and to assure the safety of any other person and the community." [(xiv) (emphasis added)]

Because there are conditions of release that will reasonably assure Mr. Gonzalez' appearance in court and the safety of the community, he should be released.

**VII. Statistics Showing that It Is Extraordinarily Rare for Defendants on Bond to Flee or Recidivate Further Demonstrate that the Foregoing Conditions of Release Will Reasonably Assure Appearance and Safety.**

It is not necessary to detain Mr. Gonzalez to meet the primary goals of the BRA, which are to "reasonably assure" appearance in court and community safety. § 3142(e). In this case, this Court should be guided by AO statistics showing that nearly everyone released pending trial in the federal system appears in court and does not reoffend. In fact, in 2025, 99% of released federal defendants nationwide appeared for court as required and nearly 98% were not arrested for new crimes on bond.[59] Significantly, this near-perfect compliance rate is seen equally in federal districts with very high release rates and those with very low release rates.[60] Even in

---

[59] App. 1, AO Table H-15 (Sept. 30, 2025). These high compliance rates have remained remarkably consistent over time, both before and after the pandemic. See, e.g., Mot. for Bond, United States v. Rodriguez, No. 19-CR-77 (E.D. Wis. Apr. 2, 2020), ECF No. 41, Ex. 1, archived at https://perma.cc/LYG4-AX4H (showing a nationwide appearance rate of 99% and non-rearrest rate of 98%).

[60] The data showing near-perfect compliance on bond is illustrated in the figure below. Siegler, supra note 1, at 25 fig.4. The districts with the highest and lowest release rates were identified using the version of AO Table H-14A for the 12-month period ending September 30, 2021. See App. 2, AO Table H-14A (Sept. 30, 2025), https://perma.cc/CYV5-3TZ6. The failure-to-appear and rearrest rates for these districts were calculated using App. 1, AO Table H-15. With regard to flight, the ten federal districts with the lowest release rates (average 20.00%) have an average failure-to-appear rate of 1.6%, while the ten districts with the highest release rates (average 64%) have an even lower failure-to-appear rate of 1.1%. See App. 1; App. 2. With regard to recidivism, the ten districts with the lowest release rates have an average rearrest rate on bond of 0.8%, while the ten districts with the highest release rates have an average rearrest rate of 1.1%. See App. 1; App. 2.

districts that release two-thirds of all federal defendants on bond, just 1% fail to appear in court and 1% are rearrested while released.[61]

The bond statistics for this district likewise strongly suggest that Mr. Gonzalez should be released. In this district, released federal defendants appeared for court 97% of the time in 2025, and only 2.2% of defendants were rearrested on release. *See* App. 1, AO Table H-15. Yet despite the statistically low risk of flight and recidivism that defendants like Mr. Gonzalez pose, the government recommends detention in 71% of cases nationwide and in 70.5 % of cases in this district. *See* App. 3, AO Table H-3. Clearly the government's detention requests are not tailored to the low risk of flight and recidivism that defendants in this district and elsewhere pose.

Mr. Gonzalez must be released because the government has not established that he would be among the approximately 1% of defendants who fail to appear in court or are rearrested on bond. Detaining Mr. Gonzalez without such evidence violates their constitutionally protected liberty interest.

## VIII. Conclusion

For these reasons, Cesar Gonzalez respectfully requests that this Court revoke the magistrate judge's detention order and order that he be released upon the conditions detailed above.

Dated: July 6, 2026

Respectfully submitted,

CESAR GONZALEZ

/s/ William J. O'Neil
WILLIAM J. O'NEIL
Attorney for the Defendant
280 N. Main St., Ste. 6
East Longmeadow, MA 01028
(413) 224-2694
BBO#:548445

---

[61] See App. 1; App. 2.

## CERTIFICATE OF SERVICE

I hereby certify that true copies of this document will be served on the registered parties through the ECF system on this date July 6, 2026.

/s/ William J. O'Neil
William J. O'Neil
280 N. Main Street, Ste. 6
E. Longmeadow, MA 01028
(413) 224-2694
BBO#: 548445